**CAUBLE et al. v. CAUBLE.　(No. 6955.)**

(Court of Civil Appeals of Texas. Austin.
April 20, 1926.)

**1. Pleading ⬌406(8).**

Exceptions to plaintiff's pleading raising issue of misjoinder of parties and causes of action were waived, where not seasonably filed.

**2. Appeal and error ⬌1039(3)—Any error in joining issue of foreclosure of vendor's lien on homestead of one defendant in suit to recover amount paid by plaintiff to discharge judgment against defendants held harmless, where such issue was denied by judgment.**

In suit to recover amount plaintiff paid to discharge judgment against defendants on their joint note, any error in joining issue of attempt to foreclose vendor's liens on homestead of one defendant *held* harmless where such issue was denied by judgment.

**3. Action ⬌50(5)—Joinder of issues in suit to recover amount plaintiff paid on judgment recovered on joint note of defendants, evidencing debt of codefendant on which defendants were sureties, and which note was secured in part by vendor's lien on codefendant's homestead and by chattel mortgage, held proper, where liability of all defendants grew out of same transaction.**

In suit for amount plaintiff paid on judgment recovered on joint note of defendants, evidencing debt of codefendant on which defendants were sureties, which note was secured in part by a vendor's lien on codefendant's homestead and by a chattel mortgage given by him as principal debtor, and in which asserted liability of all defendants grew out of same transaction, joinder of such issues in single suit *held* proper, where codefendant was principal debtor and defendants were liable, if at all, only as sureties, and were entitled to have collateral and codefendant's liability applied to extinguishment of debt before resort could be had to their property.

**4. Principal and surety ⬌190(7)—Admission in evidence of draft representing balance due on judgment at time it was paid by plaintiff for defendants, and showing that by paying draft judgment was discharged, held not erroneous.**

In suit to recover amount plaintiff paid on judgment recovered on joint note of defendants, admission in evidence of draft, representing balance due on judgment at time it was paid, and showing that by paying the draft judgment was discharged, *held* not erroneous.

**5. Principal and surety ⬌190(7) — Evidence that plaintiff paying judgment recovered against defendants would not agree with either judgment creditor or defendant to take mortgaged cattle held admissible on issue of what agreement of parties was when draft representing balance due on judgment was drawn.**

In suit to recover amount paid by plaintiff to satisfy judgment recovered on joint note of defendants, testimony of plaintiff that he would not agree with judgment creditor or defendant

to take cattle that were mortgaged to creditor to pay off a debt on the cattle *held* admissible on issue of what agreement of parties was when draft representing balance due on judgment at time it was paid was drawn.

**6. Appeal and error ⬌1050(2)—Any error in permitting plaintiff paying judgment recovered on joint note of defendants to explain why he was not present when judgment was rendered and why he permitted judgment to go against him by default held harmless, where evidence was immaterial.**

In suit to recover amount plaintiff paid on judgment recovered on joint note of defendants, any error in permitting plaintiff to explain why he was not present when judgment was rendered, and that he permitted judgment to go against him by default, *held* harmless as being immaterial, since, if judgment was res judicata as to liability between defendants therein, evidence was incompetent, and, if not conclusive, then reasons for plaintiff's failure to appear were immaterial.

**7. Appeal and error ⬌1046(5).**

Remarks of judge alleged to constitute comment on weight of testimony *held* harmless, where verdict was rendered by jury at court's direction.

**8. Principal and surety ⬌190(7)—Admission in evidence of blank note, signed by plaintiff and one of defendants during negotiations looking to taking up draft representing balance due on judgment at time it was paid by plaintiff, held not erroneous.**

In suit to recover amount paid by plaintiff to satisfy judgment on joint note of defendants, admission in evidence of blank note signed by plaintiff and one of defendants, made during negotiations looking to taking up draft representing balance due on judgment when it was paid, *held* not erroneous, where plaintiff's theory of action was that note was given as security for what he might have to pay on judgment.

**9. Judgment ⬌582, 631—In suit by plaintiff for reimbursement for amount paid to discharge judgment recovered against defendants on their joint note, note held merged in judgment, and judgment discharged by payment in full by plaintiff (Uniform Negotiable Instruments Act, §§ 119, 120 [Vernon's Ann. Civ. St. Supp. 1922, arts. 6001—119, 6001—120]).**

In suit for reimbursement for amount plaintiff paid to discharge judgment recovered on joint note of defendants, in which no liability was based upon continued existence of note, note was merged in judgment, and judgment was discharged by payment in full by plaintiff, Uniform Negotiable Instruments Act, §§ 119, 120 [Vernon's Ann. Civ. St. Supp. 1922, arts. 6001—119, 6001—120), being inapplicable.

**10. Principal and surety ⬌5 — If plaintiff agreed unconditionally to buy mortgaged cattle and pay off mortgage indebtedness to mortgagee, he became principal obligor for unpaid balance of mortgage note, and would have no right of reimbursement against sureties on mortgage indebtedness.**

If plaintiff agreed unconditionally to buy mortgaged cattle at stipulated price and pay off

mortgage indebtedness to mortgagee under adjustment, plaintiff became principal obligor to mortgagee on unpaid balance of mortgage note, and hence would have no right of reimbursement against sureties on mortgage indebtedness; but if plaintiff's agreement was only to assist sureties and mortgagor in raising amount necessary to satisfy indebtedness to mortgagee, and its nonpayment was not result of breach of contract on his part, then plaintiff was not principal debtor as between him and sureties and mortgagor.

**11. Principal and surety 🔑105(3)—If note and mortgage were given only to provide additional security to plaintiff in his liability on judgment recovered against defendants, there was no release of defendants as sureties, but if note was executed in settlement of that liability and postponed payment for a definite time, then defendants were released.**

If note and mortgage were given only for purpose of additional security to plaintiff in his liability on judgment recovered against defendants on their joint note, there was no release of defendants, but if note was executed in settlement of that liability and postponed payment thereof for a definite time, then they were released.

**12. Judgment 🔑208—At common law, in absence of statute, one defendant to a suit could not recover a judgment against a codefendant.**

At common law, in absence of statute, one defendant to a suit could not recover a judgment against a codefendant, because issue is as to liability of defendants to plaintiff, and not as to liability of defendants as between themselves, and if one defendant is entitled to contribution or other relief against his codefendant, it must be obtained in an independent action.

**13. Judgment 🔑704.**

As between codefendants, nothing is adjudicated by a joint judgment against them.

**14. Judgment 🔑17(1), 490(1)—Default judgment not reciting service and record nowhere showing it, and undisputed evidence being to effect that no service was had, held void and open to collateral attack.**

In suit on note, defendant's judgment against codefendant by default *held* void and open to collateral attack, where it did not recite service on codefendant, and record nowhere showed it, and undisputed evidence was to effect that no service was had.

Appeal from District Court, Tom Green County; Carter T. Dalton, Special Judge.

Suit by C. M. Cauble against George C. Cauble and others. From an adverse judgment, defendants appeal. Affirmed in part, and in part reversed and remanded.

W. A. Anderson and Guy R. Mobley, both of San Angelo, for appellants.

Collins & Jackson, of San Angelo, and J. A. Templeton, of Fort Worth, for appellee.

McCLENDON, C. J. This suit is between C. M. Cauble, appellee and plaintiff below, and George C. Cauble, Sr., George C. Cauble, Jr., and I. B. Cauble, appellants and defendants below. For convenience we will omit the surname Cauble, and refer to the parties by their initials, respectively, as C. M., G. C., Sr., G. C., Jr., and I. B.

The suit grew out of the following transactions: On January 24, 1919, G. C., Sr., G. C., Jr., and I. B., executed and delivered to W. B. Currie their note for the sum of $33,640.54, providing for interest at 10 per cent. and attorney's fees, and maturing June 1, 1919. This note was given in renewal and extension of indebtedness of G. C., Sr., to Currie of some years' standing, and was secured by chattel mortgage on certain cattle belonging to G. C., Sr. At that time G. C., Sr., was in straitened financial circumstances, and Currie was pressing him for payment or additional security. This note was executed as a result of these negotiations, G. C., Jr., and I. B. thereby becoming sureties for G. C., Sr., upon the indebtedness. On January 21, 1919, G. C., Sr., and wife, Mary, executed a deed to 34¾ acres of land constituting their homestead to G. C., Jr., who in turn executed a $8,000 vendor's lien note in favor of G. C., Sr. This note was indorsed to Currie as additional security. On August 16, 1919, Currie brought suit in Howard county against the three Caubles on the note of January 24, 1919, and sought to foreclose his chattel mortgage lien on the cattle and the vendor's lien securing the $8,000 note. While this suit was pending, C. M., who was an uncle of G. C., Sr., and I. B., was importuned by G. C., Sr., to assist in saving the situation, and as a result of some negotiation an adjustment was made on September 9, 1919. Under this adjustment C. M. purchased the cattle covered by the chattel mortgage securing the debt for the agreed sum of $22,080. There had previously been a credit on the note, and the balance of the principal and interest at the date of this adjustment was $8,610, and Currie agreed to remit the attorney's fees, and I. B. agreed to pay the court costs upon the carrying out of the adjustment under which Currie was to receive the proceeds of the cattle, plus $8,610. In carrying out the adjustment two drafts were drawn by C. M. in favor of Currie, one for $20,080 and the other for $8,610. The former was drawn on a Kansas City bank, and attached to it was a bill of sale for the cattle by G. C., Sr., to C. M., and a release signed by Currie of his chattel mortgage, which recited that G. C., Sr., and G. C., Jr., had paid in full the indebtedness represented by the $33,540.54 note of January 24, 1919. This draft was paid. The other draft was drawn on the Central National Bank of San Angelo, but was not paid. On December 29, 1919, Currie amended his pleadings in the Howard county suit, making C. M. a party defend-

ant, set up the adjustment agreement and its failure of consummation in that the $8,610 draft was not paid, and sought to recover against the three original defendants and C. M. the remaining $8,610, besides interest and attorney's fees. C. M. was served upon this amended petition. On January 31, 1920, I. B. filed a cross-action against C. M., in which he alleged substantially that the latter had agreed to pay off the $8,610 balance, and that he, I. B., was thereby released from the indebtedness, and he asked judgment over against C. M. in case any judgment was rendered against him in favor of Currie.

The record does not show any service on C. M. on this cross-action, and the testimony shows there was no service. On February 3, 1920, Currie obtained judgment against the four Caubles for the sum of $9,849.84, stated in the judgment as being principal, $8,610, interest thereon from September 9, 1919, and 10 per cent. attorney's fees. The judgment bore interest from date at the rate of 10 per cent. per annum. I. B. was given judgment over against his three codefendants for any sum he might pay on this judgment, which recites that it was by default against all defendants except I. B.

In December, 1919, another bunch of cattle owned by G. C., Sr., and which was covered by a chattel mortgage in favor of one Sugg, was sold to C. M., and the net proceeds of this sale, amounting to approximately $2,000, was paid by C. M. to Currie, and credited on the judgment. The balance of the judgment was paid by C. M. on September 6, 1921, by means of a draft drawn by Currie on C. M., under date of September 2, 1921, for $9,132. In the meantime, on February 10, 1920, G. C., Sr., executed in favor of C. M. his promissory note for $8,000, due six months after date, bearing 10 per cent. interest, and at the same time executed a chattel mortgage on certain horses to secure the note.

The foregoing statement of facts is undisputed. The only pertinent fact controversies presented by the record are with reference to the terms of the agreement between C. M. on the one hand and G. C., Sr., G. C., Jr., and I. B. on the other, with reference to the adjustment of the Currie note and the agreement under which G. C., Sr., executed the note and chattel mortgage of February 10, 1920. While the evidence with reference to the adjustment agreement is to some extent vague, still we think two inferences may fairly be drawn from the testimony of the several witnesses.

The version of C. M. was that he made or assisted in making an arrangement with Mr. Walsh, of the San Angelo Bank, to carry the amount of the $8,610 draft over and above the funds which he (C. M.) had in that bank at that time, provided the $8,000 vendor's lien collateral note was put in such shape as to assure the validity of the vendor's lien on the homestead of G. C., Sr., as security to the San Angelo Bank. A blank note was signed by G. C., Sr., and C. M., which C. M. testified was left with the San Angelo Bank. This note was to be filled in for the amount the San Angelo Bank would have to advance on the draft over and above the funds of C. M. He testified that the reason the draft was turned down was because the San Angelo Bank was not satisfied with the validity of the vendor's lien on the G. C., Sr., homestead. We quote from his testimony:

"I never did agree with W. B. Currie or Mr. I. B. Cauble either to take those cattle that were mortgaged to Mr. Currie and pay that entire debt of $33,640.54; I never did agree to do that with anybody. After I had been to Big Springs and came back here I went to see Mr. Walsh, me and George Cauble, and I had agreed up there that if they would knock off the costs, which they agreed to do, and the attorney's fees, if I could arrange and they would fix the proper security—the balance of the security they held—that I would try to get the rest of it, and that is how I came to give the draft on the Central National Bank for $8,610. The security they had left was some mules and a note on some land out here. The note was to be put in proper shape so it would be good security for Mr. Walsh, or whoever he would sell it to, and I was going on George's note, and he was taking that as collateral security, and I was loaning the balance of the money to take up the balance up there. The arrangement had been made, and we were to get the papers all in proper shape so it would be acceptable to Mr. Walsh, and attach the draft. I gave them the papers and let them come to the bank here. The $8,000 land note is the one I am speaking of that was to come here to Mr. Walsh, together with a mortgage on some mules and life insurance policies. They fixed the papers up and sent them down here, and Mr. Walsh said it was no security, and they sent them back. I think George Cauble and myself made the note to Mr. Walsh; that is, we signed it up so I would not have to come back here, and I think he mailed it back to me. I told them the circumstances and what would have to be done in order to make that draft good so Mr. Walsh would pay it. I told them just what Mr. Walsh told me, and the draft was drawn under those circumstances. I first learned that it was not paid shortly after I got back home, when I received a letter from Morrison & Morrison that the draft had been turned down. I don't remember whether he told me why it was turned down or not, but he told me all that Mr. Walsh had said. I never got anything for that draft."

G. C., Sr.'s, version of the transaction was that C. M. agreed to buy the cattle at the price stipulated and to discharge the $8,610 balance due Currie under the adjustment, and carry this amount for G. C., Sr. He denied that the $8,000 vendor's lien note was to be used in any way as collateral, or that it was attached to the $8,610 draft or that the validity of the vendor's lien on the homestead had anything to do with the draft's being turned down. He attributed the nonpayment of the draft to the fact that C. M.

did not have sufficient funds in the San Angelo Bank to meet it, and that the bank was not willing to advance the balance. We quote the following excerpts from his testimony:

"These drafts, one for $22,080 and the other for $8,610, were given by Uncle Charley to pay off all this indebtedness, every dollar that was against the cattle. On that date Mr. Currie released that note and the mortgage securing it, but I don't know what became of the release. I know the release was attached to the draft that went to the Drovers National Bank people. There could not have been a release attached to the draft that was sent to the Central National Bank because they were furnished with only one release, and I don't think a release accompanied that draft. I know the draft for $8,610 was sent to the Central National Bank, because I know Uncle Charley gave it. * * * After breakfast we all got together, and Uncle Charley asked them to knock off the attorney's fees and pay the court costs, that he was in a hurry, and they all agreed, and it took nearly all day there in Morrison & Morrison's office, but we had a fair and square settlement; he said he would help as long as he had 50 cents; we had been partners. * * * He lacked a little at the Central National Bank having funds enough to pay the draft, and it was turned down. I don't know whether it went to C. M. Cauble or M. Currie. This is the note we filled out at the Central National Bank in San Angelo, myself and Uncle Charley, and we carried it up there and brought it back, and later I gave this to Uncle Charley; I brought it back myself. We never filled it out because he said he had enough here to pay the little balance. Uncle Charley told me what to do with it; he told me he thought he had money enough in the Central National Bank to pay the balance; that is what we carried it there for—to use it if we needed it. * * * On the day these drafts were given Mr. Morrison did the work as fast as he could, and did it exactly like we told him. Mr. Currie was there part of the time, and when they got through these drafts were made, and I think Mr. Jim Currie filled out the drafts. * * * C. M. Cauble made the statement to Mr. Currie at Big Springs at the time these two drafts were given about making off the Currie note; he made it first, last and all the time, and never did quit making it. He said, 'I will help you until I die.' He said to Mr. Currie, 'I am going to take up this note if you can handle this 10 per cent. attorney's fees and the court costs; I am ready to take hold of this deal right now.' They studied a little and came back and said they would take care of it. That was before the drafts were given. Mr. Currie said he would handle the attorney's fees, and my brother said he would pay the court costs—it was not much up to that time. · Uncle Charles said, 'All right; go ahead and get up the papers as soon as you can,' and I believe he said he wanted to go to the Martin County ranch. * * * Here is a note in blank dated September 8, 1919, signed by G. C. Cauble and C. M. Cauble, written in green ink, due March 8, 1920, Albany, Tex.; I do not know whether that is Mr. Walsh's handwriting, I don't know his handwriting. We got that note ourselves right out of this bank, and I never denied it. Mr. C. M. Cauble told Mr. Walsh if he needed that he

would draw for it, and the amount could be filled in, and he was making that arrangement because he didn't want to come back this way. I don't know it to be a fact, like C. M. Cauble testified, that he went in there and arranged with Mr. Walsh about this collateral; there was no collateral mentioned, and there was nothing said about it. ·There was no security to be given, except my signature and that of C. M. Cauble; he didn't know whether he would need it or not. He had some money there in the bank, and maybe this check (note) would not have to be filled in."

There is a like conflict in the testimony with reference to the execution of the $8,000 note and chattel mortgage of February 10, 1920. C. M.'s testimony is to the effect that this note was not given in settlement of the liability to him on the note transaction, but merely as security for what he might have to pay on the judgment. The testimony of G. C., Sr., on the other hand, is clearly to the effect that when this note was executed there was a full settlement between him and C. M., and this settlement was represented by the note and chattel mortgage.

This suit was brought by appellee, C. M., against the appellants, G. C., Sr., G. C., Jr., and I. B. (the wife of G. C., Sr., being also made a party defendant) to recover: (1) Against the three appellants the amount paid by C. M. to discharge the Currie judgment; (2) against G. C., Sr., the amount of the $8,000 note of February 10, 1920, and to foreclose the chattel mortgage securing it; and (3) against all defendants to foreclose the vendor's lien securing the G. C., Jr., $8,000 note.

The cause was tried to a jury, and upon the conclusion of the evidence the court under a directed verdict rendered judgment as follows: In favor of appellee against the three appellants for $10,999.95 (the amount of the $9,132.00 draft with 6 per cent. interest thereon from September 6, 1921), with interest thereon at 6 per cent. from date of judgment; against G. C., Sr., for $11,988.76 (representing the principal and interest of the $8,000 note of February 10, 1920), together with 10 per cent. interest thereon from the date of judgment with foreclosure of the chattel mortgage; and (3) in favor of G. C., Jr., on the $8,000 vendor's lien note. The judgment provided that whatever might be realized from the chattel mortgage foreclosure or from the judgment on the $8,000 note against G. C., Sr., be credited on the judgment first awarded against the three appellants.

The appeal is from this judgment upon 13 assignments of error, numbered consecutively (omitting No. 6) from 1 to 14.

The first four assignments complain of the trial court's refusal to sustain certain exceptions to appellees' pleadings which raise the issue of misjoinder of parties and causes of actions.

[1] Aside from the fact that those exceptions were not seasonably filed, and were therefore waived, they are manifestly without merit.

[2] The attempt to foreclose the vendor's lien on the G. C., Sr., homestead was denied by the judgment, and whatever error there may have been in joining this issue in the suit was thereby rendered harmless.

[3] The theory of plaintiff's suit was that he was compelled to pay a judgment recovered upon the joint note of appellants, evidencing a debt of G. C., Sr., upon which G. C., Jr., and I. B. were sureties, which note was secured, to the extent of the G. C., Jr., note, by a vendor's lien on G. C., Sr.'s, homestead, and by a chattel mortgage given by G. C., Sr., the principal debtor. The asserted liability of all the appellants grew out of the same transaction, and not only do we think the joinder of these issues in a single suit permissible, but we hardly see how they could be properly tried and the equities of the several parties properly adjusted by splitting up the several claims of appellee into separate suits. G. C., Sr., was admittedly the principal debtor in the transaction, and his coappellants, if liable at all, were so only as his sureties. The latter were entitled to have the collateral and the liability of G. C., Sr., applied to the extinguishment of the debt before resort could be had to their property. These assignments are overruled.

[4] The fifth assignment reads as follows:

"Because the court erred in overruling the defendant's objection to the introduction in evidence by the plaintiff's draft for the sum of $9,-132, and in permitting the introduction of said draft in evidence in behalf of the plaintiff, for the reason that it shows to be a transaction between plaintiff, C. M. Cauble, and W. B. Currie, and does not show any connection or liability on the part of these defendants, but was a transaction between strangers, so far as these defendants are concerned, and because said draft shows upon the face thereof to be accompanied by a release of judgment, and the release of such judgment not being accounted for, nor nothing in connection with the draft to show what judgment was released, and because if the judgment was a matter of fact released, and if it was the judgment against all of these defendants, then it would emphasize the defendant's plea of misjoinder of causes of action, and would show that no liability on the part of these defendants for or on account of any judgment asserted by the plaintiff, would be discharged so far as defendants are concerned, there being no assignment of any judgment pleaded or offered in evidence, the payment of same would be an extinguishment of the debt, and plaintiff could not recover herein by reason of the payment of said draft, which testimony was admitted over the objection of the defendants."

The evidence shows that the draft represented the balance due on the judgment at the time it was paid, and that by paying the draft the judgment was discharged. Upon this issue there was no dispute. Appellee's suit was not upon the judgment, as assignee thereof, but was for reimbursement for the amount he was required to pay to discharge it. The assignment has no merit and is overruled.

[5] The seventh assignment complains of the court's action in permitting C. M. to testify:

"That he would not at any time agree with Mr. W. B. Currie or Mr. Cauble or either of them to take the cattle that were mortgaged to Mr. Currie and pay off the debt of $33,000 on the cattle; that were mortgaged to Mr. Currie."

This evidence was clearly admissible on the issue of what the agreement of the parties was when the $8,610 draft was drawn. The assignment is overruled.

[6] The eighth assignment complains of the action of the trial court in permitting C. M. to explain why he was not present when the Currie judgment was rendered and permitted judgment to go against him by default. This evidence, as we view the case, was immaterial, but its admission was harmless, and we overrule the assignment. If the Currie judgment was res adjudicata as to the liability, inter sese, of the defendants therein, then the evidence was incompetent, since the binding effect of the judgment could not be questioned collaterally. If, on the other hand, as we hereafter hold, the judgment was not conclusive of the liability of the defendants therein among themselves, then the reasons for C. M.'s failure to appear at the trial had no bearing upon the case.

[7] We also overrule the ninth assignment, which complains of certain remarks of the judge as being a comment on the weight of the testimony "and a direct intimation from the court to the jury as to his views of the testimony." We hardly see how it could be seriously urged that any statement made by the court during the conduct of the trial could have any effect whatever upon the verdict of the jury when that verdict was rendered at the court's direction. To paraphrase the language of Tomerlin v. Krause (Tex. Civ. App.) 278 S. W. 501: If there is any issuable fact to go to the jury, the action of the court in giving a peremptory instruction is error, regardless of any comment the court may have made touching the effect of the evidence. On the other hand, of the court's action in peremptorily instructing the jury is correct, it necessarily follows that the judgment which the court renders upon such verdict is the only judgment which the evidence will support. In such event the act of directing a verdict overshadows and renders unimportant any comment on the mere weight of the testimony which the court may have made during the trial.

[8] The tenth assignment complains of the admission of the blank note signed by C. M.

and G. C., Sr., as affecting the interests of G. C., Jr., and I. B. This assignment is manifestly without merit and is overruled. This note was signed during the negotiations looking to taking up the $8,610 draft, although C. M. and G. C., Sr., differ as to the exact manner in which it was to be used. If appellee's version of the agreement concerning the $8,-610 draft is correct, then the entire transaction regarding the draft and the failure to have it paid by the San Angelo Bank was material. If, on the other hand, C. M., by this agreement, bound himself, unconditionally, to pay off the $8,610 balance under the settlement with Currie, subsequent negotiations regarding the matters were immaterial. The blank note was clearly admissible under appellee's theory of the case.

The eleventh, twelfth, and thirteenth assignments will be considered together, as they deal with the court's peremptory instructions and the refusal to peremptorily instruct in favor of I. B. These affect only the liability of G. C., Jr., and I. B., who were sureties for G. C., Sr.

[9] The first proposition made with reference to these assignments is that C. M. became primarily liable for the debt evidenced by the Currie note when he purchased the cattle covered by the mortgage securing that note, and the sureties thereon were thereby released as between themselves and C. M.— citing sections 119 and 120 of the Uniform Negotiable Instruments Act (Vernon's Ann. Civ. St. Supp. 1922, arts. 6001—119, 6001—120), and Gunst v. Pelham, 74 Tex. 586, 12 S. W. 233, and Parten v. Martin (Tex. Civ. App.) 240 S. W. 1037. It is not pointed out in what respects these articles support the asserted proposition, nor have we been able, thus unaided, to construct a theory under which they have any application to the proposition. Appellee did not sue upon the Currie note, or assert any liability based upon its continued existence. That note was clearly merged in the judgment, and the judgment was discharged by payment in full made by one of the defendants in judgment.

[10] In the two cases cited the purchaser of the mortgaged property assumed the payment of the mortgage debt as consideration for his purchase. Clearly, under such circumstances, as between the mortgagor and purchaser of the mortgaged property, the latter, under his express assumption, became the principal debtor and the mortgagor the surety. This principle, we think, applies as between G. C., Jr., and I. B. on the one hand and C. M. on the other, under the theory of the case presented by the above testimony of G. C., Sr. Our interpretation of that testimony is that it would warrant a finding that C. M. agreed unconditionally to buy the cattle at the stipulated price and pay off the $8,610 balance to Currie under the adjustment. Under this theory C. M. became the

principal obligor to Currie on the unpaid balance of the Currie note, and he would therefore have no right of reimbursement against G. C., Jr., and I. B.

On the other hand, if, as testified to by C. M., his agreement was only to assist appellants in raising the $8,610 to satisfy the draft, and its nonpayment was not the result of breach of contract on his part, but was the result of failure or inability on the part of appellants or some of them to make the requisite financial arrangements to take up the draft, then the purchase of the mortgaged cattle did not have the effect of making C. M. the principal debtor as between him and appellants or any of them. All the parties affected agreed to this purchase at the stipulated price. The liability of C. M. to discharge the $8,610 balance, as between him and appellants, depended upon the terms of his agreement with them, as to which the evidence was conflicting.

[11] The further proposition under these assignments is made that the execution of the note and mortgage of February 10, 1920, operated as a release of liability against G. C., Jr., and I. B. The conflict in evidence presented by the testimony of C. M. and G. C., Sr., regarding the circumstances under which this note and mortgage were executed is shown above. If, as testified to by C. M., the note and mortgage were given only for the purpose of additional security to C. M. in his liability on the Currie judgment, there was no release of G. C., Jr., or I. B. But if the note was executed in settlement of that liability and postponed payment thereof for a definite time, then they were released. The following authorities support this holding: Bank v. Bray, 105 Tex. 312, 148 S. W. 290; Darby v. Bank (Tex. Civ. App.) 253 S. W. 341; and authorities there cited.

The remaining propositions under these assignments are based upon the contention that the Currie judgment is res adjudicata of the liability of G. C., Jr., and I. B. in favor of C. M. for reimbursement.

[12, 13] The general principles which control the questions raised by these propositions are thus stated in Corpus Juris, vol. 33, pp. 1131, 1132:

"At common law, and in the absence of statute changing the rule, one defendant to a suit cannot recover a judgment against a codefendant, because the issue is as to the liability of the defendants, or either of them, to plaintiff, and not as to the liability of defendants as between themselves; if one defendant is entitled to contribution, indemnity, or other relief against his codefendant, it must be obtained in an independent action. As between codefendants, nothing is adjudicated by a joint judgment against them. But in equity, a decree between codefendants may be rendered in proper cases. Under codes and practice acts, affirmative relief may be granted as between defendants in relation to the subject-matter of the action, upon proper pleadings and procedure in

accordance with the statute, it being usually provided that a judgment may determine the ultimate rights of the parties on the same side as between themselves. Service of process, or notice of some sort, as by service of a copy of the answer or cross complaint praying such relief, is essential to the validity and regularity of a judgment in favor of one defendant against his codefendant."

These principles are recognized generally in this state. Harris v. Schlinke, 95 Tex. 88, 65 S. W. 172; Traction Co. v. Polytechnic (Tex. Com. App.) 236 S. W. 73; Bomar v. Morris, 59 Tex. Civ. App. 378, 126 S. W. 663; Twichell v. Askew (Tex. Civ. App.) 141 S. W. 1072; Swift v. Beemer (Tex. Civ. App.) 160 S. W. 989; Ivey v. Davis (Tex. Civ. App.) 178 S. W. 972; Wood v. Love (Tex. Civ. App.) 190 S. W. 235; Cathey v. Weaver (Tex. Civ. App.) 193 S. W. 490; Clark v. Taylor (Tex. Civ. App.) 212 S. W. 231; Popham v. Improvement Dist. (Tex. Civ. App.) 256 S. W. 349; 34 C. J. p. 505.

In Clark v. Taylor, Chief Justice Pleasants, speaking for the Galveston court, says:

"We think the judgment in this case, like a deed conveying land to several vendees, prima facie gives an equal interest to each. It appears, however, from the record that the respective rights of the defendants in the excess proceeds of the sale were not settled by this judgment, such rights not having been put in issue by any pleading, and the affirmance of this judgment will not preclude either of the defendants from having their equities in any such excess proceeds hereafter adjudicated."

[14] The only pleading seeking relief over against C. M. was that filed by I. B. As shown above, this pleading was filed January 31, 1920, no appearance was made by C. M., and the judgment against him was by default. The judgment did not recite service on C. M., the record nowhere shows it, and the undisputed evidence is to the effect that no service was had. Under this state of the record the judgment in favor of I. B. against C. M. was a nullity and was open to collateral attack.

The propositions raising the issue of res judicata and those asserting the insufficiency of the evidence to support the judgment against G. C., Jr., and I. B. are overruled. Those asserting that the evidence did not warrant the peremptory instruction against G. C., Jr., and I. B. are sustained.

The fourteenth and last assignment complains of the peremptory instruction against G. C., Sr. The two propositions under this assignment are directed also to the thirteenth assignment, and complain, in substance, that the evidence did not conclusively show liability, and that that question should be submitted to a jury. We have already discussed this question as it relates to G. C., Jr., and I. B. G. C., Sr., testified in the case that he owed C. M. the amount represented by the note, and that the note was a valid obligation against him. He also conceded the validity of the chattel mortgage. The record without dispute shows his liability, and there was therefore no issue, in so far as he was concerned, to be passed upon by a jury.

The trial court's judgment is affirmed as to George C. Cauble, Sr., and reversed as to George C. Cauble, Jr., and I. B. Cauble, and as to them the cause is remanded for a new trial upon the issues above pointed out.

Affirmed in part, and in part reversed and remanded.